IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WARREN T. KITCHEN,

               Plaintiff,                               CV-04-828-ST

      v.                                      OPINION

WSCO PETROLEUM CORP., dba TOAD'S,

               Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

On February 16, 2005, plaintiff, Warren T. Kitchen ("Kitchen") filed a Third Amended

Complaint, alleging the following claims against his former employer, WSCO Petroleum Corp.

("WSCO"):

First Claim:  retaliation for opposition to unlawful employment practices in violation of

the Anti-Retaliation Statute pursuant to Title VII of the Civil Rights Act of 1964, 42 USC

§ 2000e *et seq*;

Second Claim:  failure to pay overtime wages and reimbursements in violation of ORS 652.150 and 652.200; and

Third Claim: prejudgment interest.

This court has jurisdiction over Kitchen's First Claim pursuant to 42 USC § 2000e and supplemental jurisdiction over the other claims pursuant to 28 USC § 1367.  Both parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

WSCO initially filed a Motion for Summary Judgment (docket # 40) against all claims on the basis of judicial estoppel, which the court denied by order dated January 13, 2005.  Opinion and Order (docket # 85).  WSCO then filed a Motion for Summary Judgment and Alternative Motions for Partial Summary Judgment (docket # 101).  Kitchen abandoned the allegation that WSCO gave him negative employment references as an act of retaliation.  On December 15, 2006, this court entered an Order denying WSCO's motion as to Kitchen's First Claim and granting that motion as to the Second Claim (docket # 119).  This Opinion explains the reasons for that ruling.

## FACTS

WSCO is an Oregon corporation that owns and operates almost 50 gas stations and convenience stores in Washington and Oregon.  Looney Depo, pp. 18, 37.  In 2002, WSCO employed more than 350 people in its retail locations and had a turnover rate of nearly 300%.  Tish Decl., ¶ 3.

Kitchen commenced at-will employment with WSCO on or about September 23, 2002.  Kitchen Depo, p. 17.  WSCO hired Kitchen as a manager-in-training, with the intent that he

would take over managing the Molalla store.  Looney Depo, p. 41; McCarry Depo, p. 43; Kitchen Depo, p. 39.   Jeff Sorn ("Sorn"), a WSCO station manager at the Tigard store, was assigned to train Kitchen on WSCO's paperwork, policies, and procedures.  McCarry Depo, p. 44; Kitchen Depo, p. 40.  Sorn was Kitchen's immediate supervisor, while Patrick McCarry ("McCarry") was the area supervisor and Sorn's superior.  Kitchen Depo, pp. 42-44.

In October and November 2002, Kitchen observed Sorn physically and verbally harass two female employees, and received repeated complaints from one of them about Sorn's behavior.  Kitchen Decl., ¶¶ 1-3.  Kitchen told Sorn on several occasions that this was unacceptable behavior and must cease, but Sorn told him that he was not going to get into trouble because management "wouldn't believe the girls," that he had an "in" with the company and made them "too much money to let him go."  *Id* at ¶ 4; Kitchen Depo, pp. 57, 60, 75, 80. For several days in October, Sorn asked Kitchen about details of his intimate relations with his wife.  Kitchen Decl., ¶ 5.  When Kitchen refused to discuss the subject, Sorn accused him of not being a team player and questioned how they could get along if Kitchen was not willing to discuss "guy things."  *Id*. He also graphically described to Kitchen his sexual fantasies about another female employee until Kitchen told him to stop it.  *Id* at ¶ 6.  In another incident, Sorn told Kitchen he would use a pretext to "get rid of" a female employee who had inquired about Sorn having sexual relations with another female employee.  *Id* at ¶ 7.  Although Kitchen objected to the retaliatory plan and so advised Sorn, the female employee was fired shortly thereafter.  *Id*.  Sorn also commented to Kitchen and others on several occasions that the "gals working in the store were little baby factories," which would make it easy "to get laid."  *Id* at ¶

8.  Sorn also suggested to the women that doing sexual favors for him would be a good way to keep their jobs.  *Id*.

Sorn directed Kitchen to drive him to and from work and threatened to fire him if he did not comply.  Kitchen Depo, p. 165.  He required Kitchen to shuttle him around Oregon City and Mollala even on Kitchen's days off.  *Id* at 166.  Kitchen did not complain to WSCO management because he was worried that Sorn would terminate his employment, as he had threatened to do. *Id*.

During his employment with WSCO, Kitchen had several conversations with McCarry regarding his performance.  *Id* at 46-49.  About six weeks after Kitchen's start date, McCarry informed him that Sorn was not going to be at the store much longer and that Kitchen had to take over control of the store.  *Id* at 113-14.  On another occasion, Kitchen solicited feedback on his performance from McCarry, and was told to learn the procedures at WSCO, to "keep improving, and you'll be fine."  *Id* at 51.  In another conversation, McCarry communicated to Kitchen that he wanted him to take more leadership at the store.  *Id* at 44.  In response, Kitchen explained that he was taking all the leadership he could with Sorn making decisions, and that once Sorn was gone, he would certainly take more leadership.  *Id* at 45.  McCarry replied: "Jeff [Sorn] is your boss, and you have to do what he says."  *Id*.  At an unidentified time, McCarry told Kitchen that his inventory and cash had "improved."  Kitchen Decl., Exhibit B, p. 6.[1]  At another time,

---

[1] McCarry states that from about October 2002 until Kitchen's termination, he counseled Kitchen about his performance, including inaccuracies in the banking deposits and other managerial responsibilities that he was not performing fully and adequately.  McCarry Aff, ¶ 6.  However, Kitchen denies that six weeks after he started working at WSCO, McCarry admonished him to start taking responsibility for the store and stop making excuses.  Kitchen Depo, p. 113.  He also denies having a conversation with McCarry on October 25, 2002, about his bank deposits not being accurate.  *Id* at 112.  Lastly, he denies that on December 3, 2002, McCarry told him that he did not know how to track the daily money coming in, how to reconcile the inventory or do the scheduling.  *Id* at 114.  At this juncture, the court must view the facts in Kitchen's favor.

Kitchen communicated to McCarry that he felt he had been set up for failure because Sorn had been with the company for so long.  Kitchen Depo, p. 115.

In early December 2002, Kitchen complained to McCarry about Sorn's "crude and vulgar" sexual remarks towards female employees, stated that this behavior had to stop and may cost the company money from potential lawsuits, and asked McCarry to look into it.  *Id* at 63-66. McCarry thanked him for the information and said he would "look into it."  *Id* at 64.

In late November or early December, based on a discussion with McCarry, Looney determined that Kitchen was not capable of managing the Mollala store and decided to give him a position of less responsibility as the deli manager at the same location to see how he would perform.  Looney Depo, p. 74; McCarry Depo, pp. 98-99.  McCarry informed Kitchen of Looney's decision.  McCarry Aff, ¶ 6; McCarry Depo, pp. 98-99; Kitchen Depo, pp. 53-54.[2] Kitchen understood this meant that he was no longer going to become the store manager. Kitchen Depo, p. 54.

After Kitchen complained to McCarry about Sorn, Kitchen's working relationship with Sorn worsened.  *Id* at 75-85.  Sorn threatened to get Kitchen fired (*id* at 75) and made it very clear that Kitchen's job was in Sorn's hands (*id* at 77).

On several occasions during Kitchen's employment, Eugene Tish ("Tish"), WSCO's Vice President, stopped by the Mollala store to observe the progress of some construction that was taking place.  Tish Decl ¶ 4; Tish Depo, p. 8.  During his visits, Tish was dissatisfied with the condition of the store and, based upon his observations, began to conclude that Kitchen did

---

[2] Kitchen also testified that after complaining to McCarry about Sorn's harassment, he did not speak to McCarry until December 31, 2002, when he was terminated by McCarry.  Kitchen Depo, p. 49.

not possess the leadership skills, work skills, and work ethic to be successful at WSCO.  Tish Depo, pp. 9-10, 15-16.

On Sunday, December 29, 2002, Tish stopped by the Mollala store to check on the progress of the construction and take some measurements.  Tish Decl ¶ 5.  Because the condition of the store was "gross," he personally started to clean it.  *Id*.  All of the employees working at the store, with the exception of Kitchen, eventually pitched in and worked hard to help him clean.  *Id*.  While Tish worked, Kitchen drank coffee and "watch[ed] stuff fry in the fryer."  *Id* at Exhibit 1.  The next morning, on Monday, Tish instructed Looney to terminate Kitchen.  *Id*.

On December 31, 2002, McCarry informed Kitchen that his employment was terminated because "[t]he company has changed direction, and you're not part of it."  Kitchen Depo, p. 106.[3]  When Kitchen asked him for further explanation, McCarry did not provide one.  *Id*.  Kitchen then asked him for a copy of his employee file.  *Id* at 110-11.

Just six days after Kitchen was terminated, a WSCO employee complained to her area supervisor, Kyle Krous ("Krous"), that she had been mistreated by Sorn.  Looney Depo, pp. 23-24; Tish Depo, p. 35.  Krous immediately reported the incident to Looney.  Tish Depo, p. 35.  Looney reported the complaint to Tish and then initiated an investigation into the allegations.  Tish Depo, pp. 35-36.  Looney scheduled an interview of the complainant, which Tish conducted the next day.  *Id* at 35.  During the course of the interview the complainant told Tish that another employee had also been mistreated by Sorn.  *Id* at 35-36.  Tish then interviewed her as well.  *Id*.

On January 15, 2003, at the conclusion of the investigation, Tish found that Sorn had engaged in improper conduct with the two complaining employees.  *Id* at 35-38.  After receiving

---

[3] At the time of Kitchen's termination, Looney and Tish state that they had not heard from anyone that Kitchen had complained about Sorn's behavior toward female employees.  Looney Decl ¶ 5; Tish Decl ¶ 7.

permission from WSCO's president, Tish then implemented severe disciplinary action against Sorn for his conduct, which included:  (1) a Final Written Warning; (2) One Year Disciplinary Probation; (3) being relieved of his managerial position at the Tigard location; (4) being reassigned to a location not less than 10 miles away from the location from where the complaints arose; (5) completing eight hours of remedial coaching, including sexual harassment training, after which he was required to pass a verbal examination; (6) requiring that Sorn apologize to WSCO's president for his conduct and convince WSCO's president that his future conduct would be in accordance with WSCO's rules and policies; and (7) conditioning Sorn's continued employment on Sorn's wife signing the disciplinary document and findings of fact.  *Id* at 36-37; Looney Depo, Exhibit 2.

On August 27, 2003, Kitchen submitted a six-page Intake Questionnaire to the Oregon Bureau of Labor and Industries ("BOLI") alleging that he was terminated by WSCO in retaliation for complaining to McCarry about Sorn.  Kitchen Depo, Exhibit 9.  Two days later, Kitchen executed his sworn charge of discrimination, again alleging that his termination was retaliatory.  *Id* at Exhibit 10.  His charge was later transferred to the Equal Employment Opportunity Commission ("EEOC") for investigation.  *Id* at Exhibit 11.  On February 24, 2004, the EEOC informed him that it had completed its investigation into his allegation of retaliatory termination and unless he could offer additional evidence, his charge would be dismissed because the "termination was the result of [his] performance problems which were well documented by his employer."  *Id* at Exhibit 12.  Kitchen does not believe he submitted any additional evidence by the EEOC deadline.  *Id* at 155-56.

7 - OPINION

Thereafter, on June 17, 2004, Kitchen filed this lawsuit (docket # 1).  On February 1,

2005, Kitchen amended his complaint to allege, for the first time, that he was owed unpaid

overtime wages (docket # 20).  He amended the complaint three more times (dockets # 21, # 22

& # 30).

## DISCUSSION

### I.   Failure to Exhaust

#### A.   Demotion Claim

WSCO seeks partial summary judgment on Kitchen's retaliation claim arising from his

demotion because it was not exhausted and is now time barred.  Under 42 USC § 2000e-5(e)(1),

a claim is time barred if it is not filed within "three hundred days after the alleged unlawful

employment practice occurred, or within thirty days after receiving notice that the State or local

agency has terminated the proceedings under the State or local law, whichever is earlier, and a

copy of such charge shall be filed by the Commission with the State or local agency."

While a federal court generally may not consider allegations of discrimination not

included in a plaintiff's EEOC charge, "subject matter jurisdiction extends over all allegations of

discrimination that either fell within the scope of the EEOC's *actual* investigation or an EEOC

investigation which *can reasonably be expected* to grow out of the charge of discrimination."

*Freeman v. Oakland Unified Sch. Dist.*, 291 F3d 632, 636 (9th Cir 2002) (emphasis in original).

 After *Freeman*, the Supreme Court held that "discrete discriminatory acts are not actionable if

time barred, even when they are related to acts alleged in timely filed charges."  *Nat'l R.R.*

*Passenger Corp. v. Morgan*, 536 US 101, 113 (2002).  *Morgan* overruled previous Ninth Circuit

authority holding that if a discriminatory act took place within the limitations period and that act

was "related and similar to" acts that took place outside the limitations period, all the related acts – including the earlier acts – were actionable as part of a continuing violation. According to *Morgan*, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify" and "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" 536 US 114. A discrete retaliatory or discriminatory act "occurs" on the day that it "happens," (*id* at 110), and "each discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 US at 114.

The parties disagree on whether *Morgan* overrules the Ninth Circuit's line of cases adhering to the principle in *Freeman*. However, *Morgan* concerns the timeliness of a filing (*i.e.* the statute of limitations), rather than exhaustion. In fact, in one case decided after *Morgan*, the Ninth Circuit applied the principles espoused in *Freeman* that a court may consider "all claims of discrimination that fall within the scope of the EEOC's actual investigation or an EEOC investigation that could reasonably be expected to grow out of the charge." *Vasquez v. Co. of Los Angeles*, 349 F3d 634, 644 (9th Cir 2003). *Vasquez* did not discuss *Morgan* and its consequences. Therefore, *Morgan* is inapplicable to the exhaustion issue.

WSCO contends that the demotion claim is not reasonably related to the termination claim because Kitchen's six-page handwritten questionnaire did not mention it and Kitchen did not take advantage of the opportunity offered by BOLI to add claims he had not raised before.

> In determining whether a plaintiff has exhausted allegations that she did not specify in her administrative charge, it is appropriate to consider such factors as the alleged basis of the discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred. In addition, the court should consider plaintiff's civil claims to

9 - OPINION

> be reasonably related to allegations in the charge to the extent that those
> claims are consistent with the plaintiff's original theory of the case.

*B.K.B. v. Maui Police Dept.,* 276 F3d 1091, 1100 (9ᵗʰ Cir, 2002)

Here it could be reasonably expected that Kitchen's allegation of retaliation based on his demotion would grow out of an investigation of his BOLI complaint. Both the demotion and termination were in alleged retaliation to Kitchen's complaint to McCarry about Sorn's sexual harassment; his demotion was within the same store; both were announced by McCarry; both involved the same witnesses; and both occurred within a very short period of time of each other. Therefore, WSCO's Motion for Summary Judgment for lack of exhaustion as to the retaliation claim based on the demotion is denied.

**B.    Failure to Send Personnel File Post-Termination**

The Third Amended Complaint also alleges that WSCO failed to send Kitchen his personnel file in retaliation for his filing the BOLI and EEOC complaint. Providing a copy of an employee's personnel file upon a request received within 60 days after termination is required by ORS 652.750.

Kitchen has offered some evidence in support of this claim. He testified that he asked for the file at the time of his termination and did not receive it. Kitchen Depo, p. 111. His testimony is corroborated by a letter he wrote to WSCO's payroll department on January 19, 2003, in which he requested a copy of his employee file. Kitchen Decl., Exhibit A.

However, Kitchen failed to exhaust this post-termination claim by raising it with BOLI. Absent exhaustion, Kitchen cannot raise this claim for the first time in this court. Thus, this retaliatory allegation is stricken.

**C.    Failure to Pay Some Wages**

WSCO also contends that Kitchen's claim for failure to pay wages has not been exhausted because he first demanded wages on the day he filed this lawsuit. To the contrary, Kitchen testified that within a week of termination, he wrote a letter to Looney requesting to be paid for the extra time, but did not receive a response. Kitchen Depo, pp. 134-35. He also included the failure to pay wages claim in his BOLI complaint. Kitchen Decl., Exhibit B, p. 5 ("Jeff Sorn expected myself to pick him up for work and take him partially home. If I didn't do this, my job was in jeopardy. I was never monetarily reimbursed."). Therefore, this claim is exhausted and not time barred.

## II.    Unlawful Retaliation Claim

### A.    Legal Standard

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made unlawful by this subchapter, or because has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII]." 42 USC § 2000e-3(a). The plaintiff must first establish a *prima facie* case of retaliation by showing: (1) he engaged in a protected activity; (2) his employer thereafter subjected him to an adverse employment action; and (3) the employer's action is causally linked to the protected activity. *Cohen v. Fred Meyer, Inc.*, 686 F2d 793, 796 (9th Cir 1982) (citation omitted). If the plaintiff establishes a *prima facie* case, "[t]he *McDonnell Douglas* order and allocation of proof that governs disparate treatment claims also governs retaliation claims." *Yartzoff v. Thomas*, 809 F2d 1371, 1375 (9th Cir 1987), *cert. denied*, 498 US 939 (1990). Should the plaintiff establish a *prima facie* case, the burden of production then shifts to the defendant to offer a legitimate, non-retaliatory reason for the

adverse employment action.  *Cohen*, 686 F2d at 796 (citation omitted).  This is only a burden of production and involves no credibility assessment.  *Lindsey v. SLT Los Angeles, LLC*, 447 F3d 1138, 1147-48 (9th Cir 2006), citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 US 133, 142 (2000).

Once the employer offers a non-retaliatory explanation for its decision, the plaintiff must raise a genuine factual question whether, viewing the evidence in the light most favorable to him, the employer's reasons are pretextual, *i.e.* "unworthy of credence."  *Reeves*, 530 US at 143 (citations omitted).  Although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, "the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case 'and inferences properly drawn therefrom'" on whether the defendant's explanation is pretextual.  *Id* (citation omitted).

Plaintiff retains the ultimate burden of persuading the court that defendant unlawfully retaliated against him or her.  *Cohen*, 686 F2d at 796-97 (citations omitted).  "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination [retaliation here], and it may be quite persuasive."  *Reeves*, 530 US at 147 (citation omitted).  This proof allows a trier of fact in some circumstances to "reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."  *Id*.  On the other hand, there are instances where, "although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."  *Id* at 148.

### B.    Analysis

1.      ***Prima Facie* Case**

Kitchen must first establish a *prima facie* case of retaliation by showing that: (a) he engaged in a protected activity; (b) WSCO thereafter subjected him to an adverse employment action; and (c) WSCO's action is causally linked to the protected activity.  The parties dispute all three components of the *prima facie* case.

a.      **Protected Activity**

Title VII makes it unlawful to discriminate against any individual because that person has "opposed" unlawful employment practices, or because the person has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" alleging discrimination on the basis of gender.  42 USC § 2000e-3(a).  WSCO first argues that Kitchen engaged in no activity protected under Title VII.

Paragraphs 13 and 14 of the Third Amended Complaint allege that Kitchen was retaliated against for complaining to McCarry about Sorn's behavior towards female employees and filing a complaint with BOLI/EEOC.  *Id* at ¶¶ 13, 14.  In addition, Kitchen contends that he was retaliated against for complaining to McCarry about Sorn's sabotage of Kitchen's performance and telling Sorn on repeated occasions that his behavior was unacceptable and must cease.[4]

The parties agree that Kitchen engaged in a protected activity by filing a complaint with BOLI/EEOC and repeatedly telling Sorn that his behavior towards female employees in the store was unacceptable and had to stop.  However, the parties disagree as to whether protected activity includes Kitchen's complaints to McCarry about Sorn's behavior towards female employees and

---

[4] At oral argument, Kitchen clarified that his complaints to Sorn and Sorn's response to his complaints should be construed as extra evidence of retaliation by demotion and/or termination, rather than as a separate claim.

Sorn's "sabotage" of his performance.  For the reasons that follow, the former is a protected

activity, but the latter is not.

### i. Complaint to McCarry About Sorn's Behavior Towards Female Employees

WSCO contends that Kitchen's complaint to McCarry about Sorn's behavior towards

female employees does not constitute protected activity because he did not tell McCarry who the

alleged victims were, what had taken place, or even that he had tried to stop Sorn.  WSCO relies

on the plain meaning of 42 USC § 2000e-3(a) to point out that the statute requires "opposition"

to sexual harassment, not merely notification to someone of the situation.

An employee complaining of a violation of Title VII "need not utter the magic words

'Title VII' to put an employer on notice of unlawful discrimination."  *Bahri v. Home Depot USA,*

*Inc.*, 242 F Supp 2d 922, 956 (D Or 2002).  While complaining to McCarry about Sorn, Kitchen

told him that he found Sorn's sexual remarks towards female employees to be crude and vulgar,

and that Sorn's behavior had to stop.  That language is sufficiently strong to be deemed an

opposition to Sorn's conduct and to put McCarry on notice of unlawful gender discrimination.

Therefore, it is protected activity.

### ii. Complaint to McCarry About Sorn's "Sabotage" of Kitchen's Performance

Kitchen alleges that he also reported Sorn's sabotage of his performance to McCarry,

citing page 115 of his deposition.  However, Kitchen testified telling McCarry only that he felt

he had been "set up for failure" because Sorn had been with the company for so long.  Such a

vague and general comment is not gender related and does not constitute a protected activity.

14 - OPINION

This is especially true in light of Kitchen denying any conversations with McCarry about problems with his performance, other than suggesting that he take more of a leadership role.

### b.    Adverse Employment Action

Kitchen alleges that he suffered the adverse employment actions of: (1) being demoted to deli manager; (2) being subsequently terminated; (3) being refused his personnel file; and (4) not being paid some wages.  Demotion and termination clearly constitute adverse employment actions.  As discussed above, any claim based on WSCO's refusal to provide his personnel file is dismissed for failure to exhaust.  That leaves only the issue of whether the failure pay some wages constitutes an adverse employment action.

Kitchen testified in his deposition that he was not paid for some extra work that he had performed, including the time spent driving Sorn to and from work ("an almost every day occurrence"), delivering equipment, as well as extra hours worked during the remodeling of the store.  Kitchen Depo, pp. 133-34.  However, the Third Amended Complaint alleges only that Kitchen was not paid for the time he spent driving Sorn to and from work.  *See* ¶¶ 21-22.  As a result, he cannot now rely on extra work delivering equipment and remodeling the store.

However, as explained below, WSCO had no duty to pay Kitchen for hours he spent driving Sorn to and from work because such activity does not constitute "work."  Therefore, WSCO's failure to pay is not an adverse employment action.[5]

///

///

---

[5]  Even if the time spent by Kitchen driving Sorn to and from the Molalla store amounts to "work" for which wages were due, Kitchen has failed to establish a causal link between the adverse action of WSCO's not paying and Kitchen's complaints.  This is because Sorn required Kitchen to drive him to work from the beginning before Kitchen ever complained.

c.      **Causal Link Between Protected Activity and Adverse Employment Action**

As discussed above, Kitchen cannot pursue either of his retaliation claims based on WSCO refusing to provide his personnel file and failing to pay wages.  These are the only alleged adverse employment actions taken in retaliation for Kitchen engaging in the protected activity of filing a BOLI complaint. Thus, the only remaining adverse employment actions are Kitchen's demotion and termination which Kitchen claims was in retaliation for the protected activity of complaining to McCarry about Sorn's sexual harassment of female employees.

According to Kitchen, he complained to McCarry about Sorn.  Within about three weeks, Looney demoted him to the deli manager position and his working relationship with Sorn deteriorated.  A short time thereafter, he was terminated at the direction of Looney and Tish.

Essential to showing a causal link is "evidence that the employer was aware that the plaintiff had engaged in the protected activity."  *Cohen*, 686 F2d at 796, citing *Gunther v. Washington Co.*, 623 F2d 1303, 1316 (9th Cir 1979), *aff'd*, 452 US 161 (1981).  WSCO contends that *Cohen* and *Gunther* require Kitchen to prove as part of his *prima facie* case that Tish and Looney, who made the decision to demote him and/or to terminate him, knew about his complaint to McCarry about Sorn.

In *Cohen*, the vice president of the defendant company learned that a female employee had filed a complaint with BOLI and EEOC alleging sexual discrimination by the company.  Later, the employee's supervisor implemented a new scheduling policy which resulted in unfavorable changes to the employee's work schedule.  The employee sued the company for retaliation.  In a court trial, the district court determined that the supervisor was unaware of the employee's complaints with BOLI and EEOC at the time he passed the new policy and that the

vice-president did not tell the supervisor about the complaints.  The Ninth Circuit found that the plaintiff had failed to establish a causal connection between the protected activity (the complaints) and the adverse employment action (the scheduling changes which resulted in a demotion) where the decision-maker did not know about the employee's protected activity at the time he decided to take such action.  It did not matter that the vice-president of the defendant company had knowledge of this action when he had not shared it with the supervisor or participated in the adverse employment decision.

In *Gunther*, four jail matrons sued the county for retaliation.  After a court trial, the district court found that the county sheriff who decided to eliminate the plaintiffs' jobs did not know about their complaints of gender discrimination and requests for equal pay at the time he made that decision, although the plaintiffs' supervisors were aware of such complaints.  As a result, the plaintiffs failed to establish a *prima facie* violation of their Title VII rights against retaliation.

Kitchen alleges that *Cohen* is distinguishable because the defendant in that case did not have knowledge of the protected activity before implementing the policy, but only had knowledge of the policy before enforcing it in a retaliatory manner.  However, the reasoning behind the district court's decision was unclear.  The Ninth Circuit remanded the case, finding that if the district court had based its finding of retaliation upon the *implementation* of the new company policy, then its decision could not stand.  The plaintiff had offered no evidence that the person who made the decision to implement the policy knew about the plaintiff's protected activity at the time he made the decision.  On the other hand, if the district court had based its finding of retaliation upon the (uneven) *enforcement* of the policy, then its decision could stand because the decision-maker had knowledge at the time of the enforcement.  In other words,

17 - OPINION

whatever the basis for the district court's decision, the principle embraced in *Cohen* was the same: for a plaintiff to establish a causal connection between the protected activity and the adverse employment action, he must prove that the person taking the adverse employment action knew about the plaintiff's protected activity at the time he made the adverse decision.

Kitchen also relies on cases outside the Ninth Circuit which recognize that "there are situations in which the forbidden motive of a subordinate employee can be imputed to the employer because, under the circumstances of the case, the employer simply acted as the 'cat's paw' of the subordinate." *Willis v. Marion Co. Auditor's Office*, 118 F3d 542, 547 (7th Cir 1997) (citation omitted). This "cat's paw" theory refers to employer liability that accrues when the employer acts as the conduit of a subordinate's prejudice. *Shager v. Upjohn Co.*, 913 F2d 398, 405 (7th Cir 1990). "The degree to which [the final decision maker's] decisions were based on his own independent investigation is a question of fact." *Long v. Eastfield College*, 88 F3d 300, 307 (5th Cir 1996).

Read together, *Cohen* and *Gunther*, on one hand, and the "cat's paw" cases, on the other hand, establish that a plaintiff must bring forward evidence that *either* the decision-maker *or* the person who sufficiently influences the decision-maker to the extent of becoming the *actual* decision-maker (McCarry), had knowledge of the protected activity at the time of making the decision adversely affecting the plaintiff's employment. If, however, the final decision-maker does not "rubber-stamp" the recommendation of a person with knowledge of the protected activity, but instead "base[s] his decisions on his own independent investigation, the causal link between the subordinates' retaliatory intent and the plaintiffs' terminations would be broken." *Long*, 88 F3d at 307 (citation omitted).

18 - OPINION

Unlike *Cohen* and *Gunther*, which both involved factual findings *at trial* that persons with knowledge of the protected activity did not convey that knowledge to the decision-makers within the same company, summary judgment imposes a lower evidentiary burden on Kitchen. He must submit sufficient evidence to create a genuine issue of material fact as to whether: (1) Tish and Looney knew about his protected activity at the time of their decisions; or (2) McCarry influenced either or both Tish and Looney to the point of becoming the actual decision-maker.

No one admits that McCarry actually informed Tish and Looney of Kitchen's complaint about Sorn. Nevertheless, Kitchen believes that he has submitted enough evidence to create a genuine issue of material fact as to whether McCarry was closely associated with, communicated freely with, and was in a position to influence Looney's and Tish's decisions to demote and terminate him. This evidence includes McCarry's admission that on another occasion, he immediately reported a complaint of sexual harassment to Looney. McCarry Depo, pp. 48-49. In another sexual harassment incident, Looney received the complaint and Tish conducted an investigation which resulted in discipline. *Id* at 24-25. Kitchen contends that this permits a reasonable inference that he also would have reported Kitchen's complaint about Sorn to Looney. Kitchen also points to the fact that McCarry discussed Kitchen's performance and demotion to deli manager with Looney. *Id* at 98-99. Looney admits discussing Kitchen's performance both with McCarry and Tish. Looney Depo, pp. 46-47, 52. Looney also discussed Kitchen's demotion and termination with McCarry. *Id* at 69-72. Kitchen believes this evidence is sufficient to create an issue of fact as to the influence McCarry had on Looney's evaluation of Kitchen's performance as communicated to Tish and on Tish's decision to terminate.

In *Long*, the decision-maker (a college president) simply rubber-stamped the recommendations of two department supervisors who were aware of the plaintiffs' protected actions at the time they made their recommendations of termination. The college submitted evidence that the president reviewed written statements from five employees in addition to the two department supervisors. However, the plaintiff submitted a letter from the college president stating that "made a decision to uphold the recommendation of [plaintiffs'] supervisor to terminate [plaintiffs'] employment." *Id*. The court found that this created a genuine issue of material fact precluding summary judgment.

In *Shager*, an age discrimination case, the plaintiff submitted evidence that his supervisor recommended to the committee which reviews personnel actions that he should be fired; the supervisor was the district manager; he exaggerated the plaintiff's deficiencies; the committee's deliberations were brief and no member of the committee who was deposed could remember having considered the issue. The court denied summary judgment to employer, finding that the plaintiff had offered enough evidence to create a fact issue as to whether the committee was acting as a "conduit to [the supervisor's] prejudice." 913 F2d at 405.[6]

In comparison to these "cat's paw" cases finding a fact issue as to influence of a plaintiff's supervisor over the decision-maker, Kitchen's evidence is weak. However, drawing all the inferences in Kitchen's favor, as this court must at this juncture, it is reasonable to conclude that Looney and/or Tish made their adverse decisions after learning about Kitchen's complaint to McCarry. In the past, McCarry reported another sexual harassment claim to

---

[6]  The other "cat's paw" cases that Kitchen relied upon are not helpful at giving a measure of the amount of evidence a plaintiff must present at summary judgment, as they involve motions for judgment as a matter of law after jury verdicts. *See Willis, supra*; *Delli Santi v. CNA Ins. Co.*, 88 F3d 192 (3rd Cir 1996); *Kientzy v. McDonnell Douglas Corp.*, 990 F2d 1051 (8th Cir 2003).

Looney and, upon receipt of a sexual harassment complaint, Looney referred it to Tish who conducted an investigation. If the same pattern was followed here, then McCarry would have reported Kitchen's complaint about Sorn to Looney, who then would have reported it to Tish. Therefore, a genuine issue of material fact exists that either Looney or Tish knew about the protected activity at the time they made the adverse employment decisions. Moreover, there is a close proximity in time (a month or less) between the complaint to McCarry, the demotion and the termination (Kitchen Depo, pp. 55-56), which creates an inference of a causal link. *See Coszalter v. City of Salem*, 320 F3d 968, 977-78 (9th Cir 2003) (cautioning that "the length of time, considered without regard to its factual setting, is not enough by itself to justify a grant of summary judgment," but finding that depending on the circumstances, "three to eight months is easily within a time range that can support an inference of retaliation").

On summary judgment, evidence that Looney and/or Tish might have known about Kitchen's complaint to McCarry, coupled with the inference drawn from temporal proximity, are sufficient to satisfy Kitchen's minimal burden of production to establish a causal link between the protected activity and the adverse employment action.

**2.      Non-Retaliatory Reason for Adverse Employment Decision**

The burden of production, but not persuasion, now shifts to WSCO to articulate a non-retaliatory motive for Kitchen's demotion and, ultimately, termination. WSCO argues that Kitchen was demoted and ultimately terminated because Kitchen did not have the skills or work ethic necessary to be successful.

While some of the evidence offered by WSCO is disputed by Kitchen, he admits that McCarry talked to him about his need to learn the procedures at WSCO and to take more of a leadership role. In late November or early December, roughly two months after Kitchen started,

21 - OPINION

WSCO's upper management determined that Kitchen was not capable of managing the Mollala store, and Looney decided to give Kitchen a position with less responsibility as the deli manager to see how he performed.  Shortly thereafter, McCarry informed Kitchen of Looney's decision.

Also, WSCO has submitted evidence that Tish had personal knowledge of and was unhappy with Kitchen's work performance.  On several occasions during Kitchen's employment at WSCO, Tish stopped by the Mollala location to observe the progress of some construction that was taking place.  During his visits, Tish was dissatisfied with the condition of the store and began to conclude that Kitchen did not possess a strong enough work ethic to be successful at WSCO.  The last straw was on Sunday, December 29, 2002, when the condition of the store was bad and Kitchen allegedly stood around watching and drinking coffee while Tish and other employees cleaned.  The next day, Tish ordered Looney to terminate Kitchen.

This amounts to sufficient evidence to support a non-retaliatory reason for Kitchen's demotion and termination.

### 3.      Pretext

Because WSCO produced sufficient evidence to support a non-retaliatory explanation for its adverse employment decisions, the inference of retaliation created by the *prima facie* case disappears and Kitchen must raise a genuine factual question whether, viewing the evidence in the light most favorable to him, WSCO's reasons are pretextual.  Kitchen contends that WSCO's articulated reasons for demoting and terminating him are pretextual because WSCO has changed its reason for firing him.

On December 31, 2002, when informing Kitchen that his employment was terminated, McCarry explained, consistent with his training at WSCO and WSCO's policy of not engaging in discussions with employees during the termination process, that WSCO was going in a

22 - OPINION

different direction.  WSCO now articulates a different reason, namely Kitchen's lagging work

performance and poor work ethic.  Kitchen believes that this inconsistency is sufficient to justify

an adverse inference concerning WSCO's motives, relying on *Byrnie v. Town of Cromwell Bd. of

Educ.*, 243 F3d 93 (2nd Cir 2001) and on *EEOC v. Sears Roebuck and Co.*, 243 F3d 846

(4th Cir 2001), finding an adverse inference of the employers' motives where the employers had

offered false justifications for their adverse employment decisions.

      In *Byrnie*, a school board failed to hire the plaintiff (who had over 21 years of teaching

experience) as an art teacher on the basis of gender and age.  The school board offered two

different reasons for its decision, the latter of which raised credibility problems.  In its answer to

the plaintiff's administrative complaint, the school board explained that the plaintiff performed

poorly in the interviews and seemed unfamiliar with teaching methods set forth in an assessment

tool developed by the state department of education.  However, during litigation, discovery

revealed that none of the candidates had any significant familiarity with the assessment tool.  In

addition, two of the interviewers stated in affidavits that the plaintiff was not hired because he

did not demonstrate familiarity with the basic competencies of effective teaching.  The court

explained that although the two explanations were not necessarily inconsistent, one was

implausible enough that a reasonable juror could interpret it as a pretext:

> A juror could believe that the latter statement was the result of an attempt
> to salvage an earlier explanation that was collapsing during civil discovery
> - and the apparent implausibility of the new explanation  was a price
> preferable to advancing a new, potentially inconsistent explanation of the
> hiring decision.

243 F3d at 106.

      In *Sears Roebuck*, a Title VII employment discrimination case on the basis of national

origin, Sears Roebuck ("Sears") proffered several reasons over time for its failure to hire the

23 - OPINION

plaintiff.  In an answer filed with the EEOC, Sears contended plaintiff had not contacted the

store and the store employees had attempted to reach him without success.  During discovery,

Sears offered the different reason that an employee had repeatedly tried to contact the plaintiff at

a work number but was told that the plaintiff was on deployment.  However, Sears did not

explain why no one attempted to contact the plaintiff at home or how human resources

overlooked the plaintiff's repeated employment applications during this time.  A manager later

testified that the reason given to the EEOC was not true, but instead that her supervisor had told

her not to go any further with plaintiff's application.  The supervisor then explained that she had

mistaken the plaintiff's identity with the identity of someone accused of sexual harassment.  The

court concluded that under the totality of the circumstances, ample evidence allowed a factfinder

to conclude that the latest asserted justification was a pretext.  "[W]hen a company, at different

times, gives different and arguably inconsistent explanations, a jury may infer that the articulated

reasons are pretextual."  243 F3d at 853 (citations omitted).

    Unlike *Byrnie* and *Sears Roebuck* which involved two potentially inconsistent

explanations, WSCO first gave a vague statement amounting to a refusal to offer an explanation

at the time of Kitchen's termination, and then an actual explanation when compelled to do so.

The reason provided to Kitchen at the time of termination is in line with WSCO's official policy

of giving a general, unjustified statement to the employee, and is even quoted as a good

"termination model" in WSCO's New Vision for Supervision training materials.  Also unlike

*Byrnie* and *Sears Roebuck*, WSCO's proffered reason for Kitchen's termination remained the

same in its answer to the BOLI complaint and throughout the litigation process.

    Even though WSCO did not give two competing official reasons, nothing changes the

fact that WSCO did not tell Kitchen the real reason for firing him until he filed the

24 - OPINION

administrative complaint.  Also, there is no evidence that Kitchen received any written warning in his employee file for his alleged sub-par job performance.  In fact, Kitchen alleges that McCarry told him not long before his demotion to "just keep improving and you'll be fine." Kitchen Depo, p. 51.

Also, there is evidence that WSCO's process in handling sexual harassment complaints was to "notify the next person up the chain."  Looney Depo, p. 23.  In January 2003, Krous reported a sexual harassment complaint by a female employee against Sorn to Looney, and Tish conducted an investigation which resulted in discipline.  The complaint to McCarry was in close temporal proximity to Kitchen's demotion and termination.  The parties do not dispute that McCarry, Looney, and Tish had repeated discussions about Kitchen's performance.   Looney also discussed Kitchen's demotion and termination with McCarry.  While there is no evidence of manipulation by McCarry, there is sufficient evidence to draw an inference that raises a material fact issue as to whether Looney and Tish knew about Kitchen's complaint at the time they reached their decisions to demote and then to terminate Kitchen.  It is possible that Tish viewed Kitchen negatively at the time of his independent investigation because he already knew about Kitchen's complaint.

WSCO also has not explained the potential inconsistency between Tish's declaration that while he and other employees were cleaning the store, Kitchen "never helped and stood around drinking coffee," and Tish's earlier account in an email to Looney that while he and others worked that Kitchen "continued to drink coffee and watch stuff fry in the fryer."  It is possible that Kitchen did not help the others because he was busy performing another job responsibility as the deli manager.

25 - OPINION

WSCO believes it is "patently implausible" that it would terminate Kitchen for unveiling Sorn's sexually harassing behavior, only to take the exact opposite approach in January 2003 in response to the other complaint of sexual harassment regarding Sorn by conducting an investigation and administering severe punishment to Sorn. However, Kitchen offers another explanation which is somewhat plausible. According to Kitchen, soon after WSCO succeeded in getting rid of Kitchen because of his complaint about Sorn, WSCO realized that it could not sweep the Sorn problem under the rug and, knowing that the misconduct likely would come to light, and decided to cover up its efforts to rid itself of Kitchen by acting in strong terms against Sorn.

Viewing the facts in the light most favorable to Kitchen, this court concludes that a combination of factors, any of which judged alone would be less than compelling, provide sufficient evidence to allow a reasonable jury to conclude that WSCO's proffered reason for demoting and then for terminating Kitchen was a pretext for retaliation.

### III.    Wage Claim

Kitchen also alleges a claim under Oregon law for failure to pay wages for time spent transporting Sorn to and from work "in excess of [his] regular full time employment." Third Amended Complaint, ¶ 23. The court must construe his claim as one for overtime wages only.[7] However, even if Kitchen had pled a claim for nonpayment of regular wages, the claim fails on the merits.

#### A.    Timeliness

---

[7] Kitchen is also asking for penalty wages under ORS 652.150 for willful nonpayment by the employer. Whether wages were owed must be decided before reaching the merits of his ORS 652.150 claim.

WSCO moves for summary judgment on the ground that Kitchen's claim for overtime wages is untimely.  Under Oregon law, actions "for overtime or premium pay or for penalties or liquidated damages for failure to pay overtime or premium pay shall be commenced within two years" (ORS 12.110(3)) and are specifically excluded from Oregon's six-year statute of limitations for other contractual claims, such as failure to pay regular wages.  ORS 12.080; *Rowe v. Laidlaw Transit, Inc.*, 244 F3d 1115, 1119 (9th Cir 2001).  Kitchen first raised his overtime wage claim in the First Amended Complaint which was filed on February 1, 2005 (docket # 20).  This was more than two years after Kitchen's termination date of December 31, 2002.  Therefore, Kitchen's claim was not filed within the applicable statute of limitations.

Kitchen responds that his claim was timely because under the Federal Labor Standards Act ("FLSA"), he is entitled to a three-year statute of limitations upon proof that the overtime violation was willful.  Kitchen presumably is referring to 29 USC § 255(a).  However, Kitchen has never alleged a claim under the FLSA.  Therefore, the FLSA statute of limitations does not apply.

## B.    Merits

Under ORS 652.140, an employer is liable to an employee for "all wages earned and unpaid at the time of the discharge or termination."  While Oregon's Wage Claim Act (ORS 652.140, 652.150, and 652.200) does not define "wages," the Oregon Court of Appeals has held that the "basis of the employee-employer relationship remains a contractual one and, in order to prevail under the Wage Claim Act, an employee must prove the agreement, express or implied, which gives him the right to expect compensation."  *Leonard v. Arrow-Tualatin*, 76 Or App 120, 123, 708 P2d 630, 632 (1985) (citation omitted).  *Leonard* adopted the definition of "work" first expressed by the Supreme Court in *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*,

27 - OPINION

321 US 590, 598 (1944), which is "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." In *Tennessee Coal*, the Supreme Court held that time spent by employees walking or riding to their workstation from the mine or factory entrance was compensable under the FLSA.  In 1947, Congress passed the Portal-to-Portal Act, 29 USC § 254, which partially overruled *Tennessee Coal* and which did not require employers to compensate employees for time spent commuting between home and their workplace or for any activities that are "preliminary to or postliminary to" their principal activities at work.  While the Portal-to-Portal Act clearly excludes from the scope of FLSA normal home to work travel time (29 CFR § 785.35), the Supreme Court has held that the "Act does not purport to change this Court's earlier descriptions of the [term] 'work.'"  *IBP, Inc. v. Alvarez*, 546 US 21, __126 S Ct 514, 520 (2005).

WSCO seeks dismissal of the wage claim based on the lack of evidence to establish that Kitchen had an agreement with WSCO, express or implied, to be compensated for driving Sorn to and from work.  WSCO also contends that driving does not constitute "work" because the efforts were not pursued necessarily and primarily for the benefit of WSCO.  Kitchen responds that WSCO placed Sorn in a position of authority over him, gave Sorn the position and tools to direct Kitchen's work activities, did not prevent Sorn from making use of that position of authority, and did not compensate Kitchen for his work.

Sorn was in an apparent position of authority over Kitchen.  Kitchen Depo, pp. 43-44 ("McCarry told me that Jeff Sorn was my boss out there, at that store, that I was to go through him . . . .").  Sorn required Kitchen to drive him to and from work and made it clear that if Kitchen did not comply, his "job was in jeopardy."  Kitchen Decl., Exhibit B, p. 5 (BOLI

28 - OPINION

complaint).  However, Kitchen has offered no evidence that he had an express or implied

agreement with his employer, WSCO, to be paid for the time used to drive Sorn to and from

work.  Furthermore, such driving was not pursued "necessarily and primarily for the benefit of

[WSCO]," but benefitted only Sorn.  Therefore, the extra hours worked by Kitchen at Sorn's

behest do not satisfy the definition of "work" adopted by the Oregon Court of Appeals in

*Leonard.  See also Smith v. Aztec Well Servicing Co.*, 462 F3d 1274 (10th Cir 2006) (where

employees sued company under the FLSA for unpaid wages covering the time required to travel

to remote work (drill) sites, the court held that carpooling required by the supervisor did not, by

itself, render the travel time compensable work under the FLSA, even where the plaintiffs

produced evidence that the employer knew about the supervisor's practice, because such time

was not an "integral and indispensable part of their principal activities").  Thus, WSCO's

motion for summary judgment on the wage claim is granted.

      DATED this 29th day of January, 2007.

            /s/ Janice M. Stewart_____
            Janice M. Stewart
            United States Magistrate Judge